# Wytheville

COMMONWEALTH OF VIRGINIA v. CITY OF NEWPORT NEWS, ET ALS.

June 16, 1932.

Present, Campbell, C. J., and Holt, Epes, Gregory and Browning, JJ.

The opinion states the case.

*John R. Saunders, Attorney-General, Edwin H. Gibson, Assistant Attorney-General,* and *Allan D. Jones,* for the appellant.

*R. M. Lett* and *J. R. Tucker,* for the appellees.

EPES, J., delivered the opinion of the court.

This is a bill brought by the Commonwealth of Virginia, at the relation of the Attorney-General, acting under the authority and direction of the Governor, against the city of Newport News and the members of its city council. The primary purpose of the bill is to restrain the city from dumping untreated sewage into Hampton Roads, and thereby polluting the oyster bottoms in the Roads and its

estuaries. The defendants demurred to the bill. The court sustained the demurrer and dismissed the bill; and the cause is here on an appeal from that decree. ·  ·  ·

The bill alleges that the city is now discharging untreated sewage into the Roads through several channels, and proposes to construct other sewer systems which will discharge untreated sewage into the Roads at new points and cause pollution of areas not now polluted. But as all legal questions raised by any of the allegations of the bill are raised by those relating to the present sewer which discharges into Salters Creek and the new pipe line which the city proposed to construct to carry this sewage further out into Hampton Roads, we shall recite only those which relate thereto. These allegations are as follows:

Newport News is situated on a point, the western side of which is washed by the waters of the James River and the eastern side by the waters of Hampton Roads. Some 3,000 yards northeast of the tip of the point Salters creek flows into the Roads, at the mouth of which and all along the northeast side of the point are tidal flats.

The main sewer of the city discharges into Salters creek some 800 yards from its mouth, and the sewage is carried thence by the tides and currents into Hampton Roads and up into James river. The sewage is discharged into these waters in its raw, untreated state.

Large areas of the bottoms of Hampton Roads and the lower reaches of the James river are suitable for planting and propagating oysters and other shellfish, and some of the bottoms come within the definition of "natural oyster beds, rocks and shoals." Much of the oyster planting ground is now, and has been for a long time, leased by the Commonwealth to private persons, from which leases it derives a considerable annual revenue. Food fish are also found and may be taken in commercial quantities in these waters.

The raw sewage discharged by Newport News into Hampton Roads has seriously polluted all the waters of Hampton Roads and James river in the vicinity of the city. The polluted area now extends up James river for more than four miles above the city, and below the city it extends fifteen miles, or more, to Old Point Comfort. In the James it extends for a mile or more off shore. As you go down the Roads it broadens out, until opposite Hampton and Old Point Comfort it extends entirely across the Roads and up into some of its estuaries on the south side of the Roads. However, it is not alleged to what extent the pollution of the lower reaches of this area is caused by the sewage from Newport News, rather than by the sewage from Hampton, Phoebus, Old Point Comfort and other settlements on the north side of the Roads and by the sewage from Ocean View, the Naval Base and the other extensive settlements below Craney Island on the south side of the Roads.

So great is the pollution caused by this sewage that the health authorities of Virginia and of the United States have declared the waters of the polluted area unfit for the propagation and taking of shellfish; and the value of these waters for purposes of fishing of all kinds has been practically destroyed. This has resulted in a diminution of the activity of tongers and planters of oysters and other shellfish, and the consequent loss of a large revenue to the State. It has also rendered these waters unfit for bathing purposes; and the health authorities of the various places along the shore line affected by the pollution have forbidden bathing therein. Many cases of infectious diseases are directly traceable to eating shellfish taken from these waters, and as a result of this pollution these tidal waters and the flats along the shore give off at ebb tide offensive and unhealthy odors which are injurious to the comfort and health of the people in the vicinity thereof.

By discharging this raw, untreated sewage into these

waters the city has created and is maintaining a general public nuisance.

The city is now about to construct a large sewer pipe extending from a point near the present outlet of the Salters creek sewer to a point in Hampton Roads approximately 2000 feet beyond low water mark, where the water is about thirteen feet deep, into which it proposes to divert the raw, untreated sewage now being discharged into Salters creek.

Sewage discharged into the Roads through the proposed pipe line will be carried by the tides and currents over a much larger area than that which is now polluted, and will pollute many more acres of natural rocks, planting grounds and fishing waters; and will substantially impair and eventually destroy the right of fishery in these waters.

The plans for the construction of the new sewer call for the dredging of a trench in the bottom of Hampton Roads thirty feet wide at the top and ten feet wide at the bottom, and the replacement of the dredged material after the pipe has been laid. This will constitute a trespass upon the lands held by the Commonwealth in trust for all its people thereof; and the effect of thus disturbing the bottom will be to cause sand and silt to be spread over a large area of bottoms now leased by the Commonwealth to private persons for the propagation of oysters, and destroy the oysters growing thereon.

The bill further alleges that the cities, towns and communities situated on Hampton Roads, as well as the Commonwealth, have a peculiar interest in seeing that the waters thereof are kept free from pollution; and in this connection states:

"This territory has been, and is being, advertised as the playground of the State of Virginia; the State has made appropriations and constituted official bodies to foster the growth and development of the port of Hampton Roads; and the State Conservation and Development Commission has concerned itself in the establishment of parks in the

vicinity of Hampton Roads. At Newport News, Fortress Monroe and Buckroe Beach, as well as at Ocean View and Willoughby Beach, large hotels catering to the traveling public, particularly summer visitors, advertise among other attractions bathing, boating and fishing. * * * Large sums of money are invested in the fish and oyster industry, and property values on the water front aforesaid * * * are greatly impaired by reason of the pollution of the tidal waters aforesaid, * * *."

The bill then charges "* * * great progress has been made in civic sanitation, and due regard for the health of its citizens has led. many municipalities to provide sewage disposal plants * * * for processing and treating raw sewage, so that * * * the effluent is rendered innocuous and odorless; * * * such plant or system may be provided by the city of Newport News at a moderate cost * * * (and) it has become and is the duty of the said city to construct and maintain such disposal plants or systems, having regard to the health not only of its citizens, but the public in general."

The bill prays: (1) That the construction, maintenance and operation of the proposed sewer line be enjoined; (2) that the city be required to abate the nuisance it is now maintaining by dumping its sewage into Salters creek; and (3) that, if the court deem it inexpedient at this time to grant such injunctions, it will enter a declaratory decree adjudging that the city is not entitled to continue to dump untreated sewage into Hampton Roads and James river, and that, unless the city shall within a reasonable time install the necessary plants and chemically treat its sewage so as to render it innocuous, the Commonwealth will be entitled to the injunctions prayed.

The allegations with reference to offensive, obnoxious and unhealthy odors being given off from the polluted waters and the flats thereof at ebb tide are "and also" allegations

thrown in as a "make weight" for the real burden of this complaint. They are apparently so treated by the appellant in its petition and argument, and we shall dismiss them without further consideration other than in this capacity.

■ There may be cases in which the dumping by a municipality of untreated sewage in large volume into a tidal water at a particular place or in a particular manner may create a menace to the health of the community and, therefore, be a public nuisance which the courts will enjoin. But the allegations here made in relation to this point are not sufficient to constitute an independent ground for injunctive relief. In addition to this the allegations of the bill read in conjunction with the exhibits filed therewith warrant the inference, if they do not plainly show, that, if at present the health of the community is being endangered by this sewage, the proposed change will go far towards remedying this trouble, if it does not entirely relieve it. It would, therefore, be premature at this time to grant an injunction on this as an independent ground for relief.

■ The right of the public to bathe in and use the waters of the Roads and its estuaries for other pleasure purposes is even more clearly an incident of the State's *jus privatum* than the common of fishery. What is hereafter said with reference to the right of the State to take away or impair, or permit the impairment of the right of fishery, applies with fully as much force to the right of the people to use tidal waters for bathing and other pleasure purposes.

■ The gist of this complaint is that discharging raw, untreated sewage in any considerable volume, at any point, in any manner, into the waters of Hampton Roads or its estuaries is illegal, because it pollutes the waters and renders shellfish and fish taken therefrom unfit for human food, and thereby subsequently impairs, and in effect destroys, the right of fishery in these waters; and is injurious to the conservation, development and carrying on of the sea food

industry in these waters. The appellant in its petition and briefs practically confines its attention to this complaint; and its contentions and argument with reference thereto are epitomized, in the next five paragraphs, in language taken largely from its bill and petition.

The State holds its tidal waters and the lands thereunder as a trustee for the benefit of all the people of the State, to be administered as a trust for the enjoyment by them of their public rights therein, and subject to certain rights of user thereof which are common to all the people of the State. This trust is an active, continuing trust; and the trustee cannot be discharged or relieved from the duty of actively and continuously administering it and enforcing the common rights of the people therein "unless by revision of our Constitution."

The tidal waters and the bottoms thereunder have long been appropriated and devoted to the use of the people as a common for the propagation, cultivation and taking of fish and shellfish therefrom; and the right to use and enjoy these waters and the bottoms thereunder for these purposes is among the rights of user thereof which are common to all the people of the State. It is a right to which the people are entitled by "common right and under the Constitution," and "is a property right, and not a mere privilege." The State may regulate the use of this right; but it may not so dispose of or authorize the use of the tidal waters or their bottoms in a way which will substantially impair, or in effect destroy, this common right of all its people to use them for these purposes.

Newport News (or any other municipality similarly situated) has the right and is under a public duty to construct sewerage systems; and may empty into these waters sewage which has been chemically treated and rendered harmless so that it will not substantially impair the right of fishery in these waters. But it has not acquired, and

cannot acquire, the right or authority to pollute these waters with untreated sewage to an extent which substantially impairs the right of fishery therein.

The General Assembly is the department of the government to which the administration of this property is committed, but the State as such is the trustee; and no alienation or disposition thereof by the General Assembly is legal which does not recognize and is not an execution of the trust upon which it is held for the people, nor is any use thereof by sufferance of the General Assembly legal which substantially impairs the common rights of fishery or other common rights of the people therein.

It is the duty of the General Assembly to make proper provision for the protection and enforcement of the common rights of the people in the tidal waters. But if it authorizes, permits, or suffers an individual or municipality to use the tidal waters or any substantial part thereof in such a way as to destroy or substantially impair the *corpus* of the trust property by destroying or substantially impairing the right of the people to exercise their common rights therein, such as the right of fishery, it is the duty of the executive department of the State government to invoke the aid of the judicial department to restrain the individual or municipality from so doing; and the courts have the jurisdiction to and should restrain him or it from so doing.

The major premise of the contention and argument of the Commonwealth is that the State holds the tidal waters and the lands thereunder upon a trust for the people of the State that they may enjoy the use thereof not only for the purposes of navigation, but also for the purpose of taking fish and shellfish therefrom; therefore, the State has no right or power to authorize or suffer them to be used for any purpose or in any manner which will destroy or substantially impair the use thereof by the people for fishery.

If this premise be false, or rather if it be not established either that the State or that the State legislature is without

power to authorize, permit or suffer the tidal waters and their bottoms to be used for any purpose which has the effect of taking away, or substantially impairing, the use thereof by the people for taking fish and shellfish therefrom, the case is controlled by the decisions of this court in *Hampton* v. *Watson*, 119 Va. 95, 89 S. E. 81, L. R. A. 1916F, 189, and *Darling* v. *Newport News*, 123 Va. 14, 96 S. E. 307, 3 A. L. R. 748, which was affirmed in *Darling* v. *Newport News*, 249 U. S. 540, 39 S. Ct. 371, 63 L. Ed. 763; and the bill was properly dismissed. We shall, therefore, confine our attention to a consideration of the soundness of this premise.

This trust theory which is relied upon by the Commonwealth appears to have had its rudimentary beginning in the opinion of Mr. Chief Justice Taney in *Martin* v. *Waddell*, 16 Pet. (U. S.) 367, 370, 10 L. Ed. 997. This case involved primarily the powers, prerogatives and rights of the British Crown. Charles II had granted to his brother, James, Duke of York, the territory now within the limits of the State of New Jersey, "together with all the lands, islands, soils, rivers, harbors, mines, * * * marshes, waters, lakes, fishings, hawkings, huntings, and fowlings, and all other royalties * * * and every of their appurtenances, * * *." The duke, for a money consideration, had granted the whole of the eastern part of this territory to certain persons, designated as proprietors, by a grant containing the above quoted terms. The proprietors in turn had granted in fee simple to certain private persons the lands under Raritan bay, a tidal water within the territory of the above grant; and from one of these grantees 100 acres thereof had passed to Martin by a regular chain of conveyances conveying it in fee simple. Martin claimed to be entitled thereby to an exclusive right of fishery in the waters overlying it. Waddell claimed an exclusive right to take oysters in the same place by virtue of a lease thereof

made to him under authority of an act of the legislature of New Jersey. In an action of ejectment brought by Martin against Waddell, the Supreme Court of the United States held, in an opinion delivered by Mr. Chief Justice Taney, that the grant by the proprietors was invalid, saying:

"The country mentioned in the letters patent was held by the king in his public and legal character, as the representative of the nation, and in trust for them. * * * The dominion and property in navigable waters, and in the lands under them, being held by the king as a public trust, the grant to an individual of an exclusive fishery in any portion of it, is so much taken from the common fund intrusted to his care for the common benefit. * * * The estate and rights of the king passed to the duke in the same condition in which they had been held by the crown, and upon the same trusts. Whatever was held by the king as a prerogative right, passed to the duke in the same character. * * * And in the judgment of the court, the land under the navigable waters passed to the grantee as one of the royalties incident to the powers of government; and were to be held by him in the same manner, and for the same purposes that the navigable waters of England, and the soils under them, are held by the crown."

As is pointed out by Farnham in his work on Waters and Water Rights, section 36a and section 42a, what is said in *Martin* v. *Waddell* relates to the powers of the British crown with reference to tidal waters and the lands thereunder, and not to the power of the State (*i. e.* the people collectively in their sovereign capacity), or of the British parliament, or of a State legislature with reference thereto. The opinion of the court makes this clear, where at page 410 of 16 Pet., it says: "* * * when the Revolution took place, the people of each State became themselves sovereign; and in that character hold the absolute right to all their navigable

waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government. *A grant made by their authority must therefore manifestly be tried and determined by different principles from those which apply to grants of the British crown, when the title is held by a single individual in trust for the whole nation.*" (Italics ours.)

The metaphorical conception of a trust used by Mr. Chief Justice Taney in defining the governmental prerogative of the British crown has been seized upon, transmuted and used by some of the courts to rationalize decisions made by them placing restrictions upon the powers of a State legislature with reference to the disposal of its tidal waters and their bottoms which are not to be found in any express constitutional provision. Thus in cases holding that a legislative grant of land under tidal waters or of authority to use tidal waters or their bottoms is invalid in so far as the grant is inconsistent with the use of the waters involved for purposes of navigation, the decisions often have been rested upon the statement that the State holds its tidal waters and their bottoms in trust for the use thereof by the people for purpose of navigation. So also some courts have gone so far as to say, and a few hold, that tidal waters and their bottoms are held by the State in trust not only for the use thereof by the people for navigation, but also for taking fish and shellfish therefrom. But no case has come to our attention which has included in the trust doctrine any rights other than those of navigation and fishery.

Probably the clearest enunciation of this trust doctrine is to be found in the opinion of the court delivered by Mr. Justice Field in *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387, 453, 13 S. Ct. 110, 118, 36 L. Ed. 1018, which was decided by a divided court (6 to 3). For this reason and because the contention and argument of the Commonwealth

is largely based thereon, and in the main stated in language which follows that of this opinion, we shall quote therefrom at length. In that case the court was considering a grant made by the legislature of Illinois to the Illinois Central Railroad Company of approximately 1,000 acres of submerged land in the harbor of Chicago, extending a mile off shore under the waters of Lake Michigan, with authority to control the use thereof, and if it so desired, to fill it in and use it for railroad purposes. In holding that the grant was subject to repeal and had been repealed by a later legislature, the court said (paragraphing and italics ours):

"The State holds the title to lands under the navigable waters of Lake Michigan, within its limits in the same manner that the State holds title to soils under tide water, by the common law, * * * and that title necessarily carried with it control over the waters above them, * * *. But it is a title different in character from that which the State holds in lands intended for sale. * * * It is a title held *in trust for the people* of the State that they may enjoy the navigation of the waters, carry on commerce over them, *and have liberty of fishing* therein freed from the obstruction or interference of private parties.

"The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of land under navigable waters that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with

*the trust to the public upon which such lands are held by the State.*

"But that is a very different doctrine from the one which would sanction the abdication of the general control over lands under the navigable waters of *an entire harbor* or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters *for the use of the public.* The trust devolving upon the State for the public,   *   *   * which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.   *   *   *

"General language sometimes found in opinions of the courts, expressive of absolute ownership and control by the State of lands under navigable waters, irrespective of any trust as to their use and disposition, must be read and construed with reference to the special facts of the particular cases. A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of navigation and use of the waters, or where parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace.   *   *   *

"We cannot, it is true, cite any authority where a grant of this kind has been held invalid, for we believe that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation. But the decisions are numerous which declare that such property is held by the State, *by virtue of its sovereignty*, in trust for the public. The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State. The trust with which they are held, therefore, *is governmental* and cannot be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining."

In *Hampton* v. *Watson*, 119 Va. 95, 89 S. E. 81, L. R. A. 1916F, 189, the court used and cited cases which use language somewhat similar to that used in *Illinois Cent. R. Co.* v. *Illinois, supra*; but it is to be noted that in *Darling* v. *Newport News*, 123 Va. 14, 96 S. E. 307, 3 A. L. R. 748 (which involved essentially the same questions as *Hampton* v. *Watson*) the court seems to have carefully avoided the use of such language.

What we think the court means to say in *Illinois Cent. R. Co.* v. *Illinois*, and other cases in which similar language has been used, is that as to tidal waters and their bottoms the State legislature occupies the relation of a trustee for the State by which it is charged with the regulation, control and appropriation thereof for the use thereof by the people for purposes of navigation, and, according to some courts, of fishery. But, they have confused their discussion of the subject by saying, inadvertently perhaps, that "the State" holds the tidal waters and their bottoms upon such a trust.

■■ It is questionable whether the interposition of the conception of a trust in these cases serves any useful purpose

or tends to clarity of thinking or correctness of decision. The *statement* that the State or the State legislature holds its tidal waters and their bottoms upon a trust establishes nothing that remained to be established before the statement was made.

It may be of some assistance in helping the mind to grasp and comprehend limitations which may be shown to exist upon the powers of a State legislature or the State over its tidal waters and their bottoms; but it wholly fails to prove or account for the existence of such limitations, which is what must be proved to sustain the decisions to support which the trust theory is invoked. Whatever will prove the existence of the trust requisite to support a decision will establish (without the interposition of the conception of a trust) the limitation upon the power of the State or the legislature which the decision declares to exist. It would be preferable, more logical, and render the decision less open to misapplication as a precedent, to rest the decision directly upon the primary premise, instead of first deducing a trust therefrom, and then deducing from the trust the limitation upon the power of the legislature which the decision holds to exist.

All possible trusts fall into one of two classes: (1) Express trusts, that is, those created by some person (or sovereign) having dominion over the property; (2) implied trusts, those which arise by operation of law. Pom. Eq. (3 ed.) sections 152–155.

It is, perhaps, not inept to say that the British crown held the tidal waters of the realm and their bottoms in trust for the use thereof by the people for navigation and for fishery, because the people collectively in their capacity as the sovereign, in which they were represented by parliament, were competent to create such a trust or to establish laws from the operation of which such a trust might arise. So also, though it is inaccurate, it is not entirely inept to

speak of the legislature of Virginia as holding its tidal waters in trust for the use of navigation in so far as any limitations upon its power to appropriate them to other uses has been placed upon its power by the State. But even in these cases it would seem more logical and less misapprehension to say that the crown or the legislature lacked the power to deny to the people the use of the tidal waters for such purposes because of limitations placed upon its power by the positive law of the sovereign, *i. e.*, or the people in their capacity as sovereign.

When, however, we are considering the State of Virginia, or any of the other States of the Union, as a sovereign entity, we are met with an entirely different situation. The people collectively in their sovereign capacity are the State. When it and the others of the thirteen original States acquired their independence, each acquired not only the powers, prerogatives and rights of the British crown, but also all the powers and rights held by the people collectively in their capacity as sovereign, which were exercised by the parliament as the representative plenipotentiary of them as the sovereign. That is, it acquired full and complete sovereignty, and therewith the full and complete dominion for governmental purposes over all the lands and waters within its territorial limits, and the full and complete proprietary right in all the lands and waters, including tidal waters and their bottoms, within its territorial limits, except to the extent that such proprietary rights had been disposed of by the sovereign State to whose powers and rights it succeeded.

To assert that the State of Virginia, as a sovereign entity, holds its tidal waters and their bottoms, or any part of the public domain, in trust for the use of the people for navigation, or fishery, or any other purpose, is to assert one of two things: (1) That such a trust has been created or has arisen from the operation of a law ordained by a power

which has a dominion over the public domain of the State superior to the sovereign authority of the State; or (2) that the State itself has created such a trust or ordained laws from the operation of which such a trust has arisen.

If it be the first, then before it may properly be asserted that such a trust exists, we must find and point out: (1) The supervening power which has the dominion and authority to create such a trust or ordain laws from which it may arise; and (2) the act or instrument by which that power has created such a trust, or the laws ordained by that power from the operation of which such a trust has arisen.

If it be the second, before it can properly be asserted that such a trust exists, we must find and point out either (1) the act or instrument by which "the State" has created the trust, or (2) the law ordained by "the State" from the operation of which it has arisen.

It is not unusual to find both the right of navigation and the right of fishery enjoyed under the common law referred to as natural rights. Sometimes the right of navigation is spoken of as a great natural right, and in some of the cases language is used which seems to imply that there is a body of natural laws, superior to any laws which the State may make, which the courts of the State must recognize and enforce. But upon reason and principle, and as is held by the better considered cases, there are no so-called natural laws which a court may recognize and enforce, any further than by their recognition in the Constitution of the State or the United States they have been ordained by "the State" as the law thereof.[1] If the basis for the trust or a

---

[1] What is said in Cooley on Constitutional Limitations with reference to the power of courts to declare legislative acts invalid is also apt here:

"Nor can a court declare a statute unconstitutional and void solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social or political rights of the citizen, unless it can be shown that such injustice is prohibited or such rights guaranteed or protected by the Constitution. It is true there are some reported cases, in which judges have been understood to intimate a doctrine different from what is here

limitation of the power of a State or its legislature which is relied upon can be found only in the so-called natural law, it is beyond the power of courts to enforce it. If it has any existence, it is enforceable only by force of arms, or by the forces of nature, or by Divine power.

Any trust created or arising from the operation of the Constitution of the United States, or limitation upon the powers of a State imposed thereby, is more properly treated as a self-imposed trust or limitation than as a trust or limitation imposed by a sovereign superior.

When we come to seek for the creation of a trust or a limitation upon its power which the State as a sovereign entity has imposed, or authorized to be imposed, upon itself as a sovereign entity, we have but two possible places in which we may look for it: (1) The Constitution of the State, and (2) the Constitution of the United States and the treaties and laws made in pursuance thereof.

By the adoption of the Constitution of the United States the State of Virginia to a limited extent, defined by the Constitution itself, relinquished a portion of its sovereignty to the United States. In so doing it imposed upon

---

asserted; but it will generally be found, on an examination of those cases, that what is said is rather by way of argument and illustration, to show the unreasonableness of putting upon constitutions such a construction as would permit legislation of the objectionable character then in question, and to induce a more cautious and patient examination of the statute, with a view to discover in it, if possible, some more just and reasonable legislative intent, than as laying down a rule by which courts would be at liberty to limit, according to their own judgment and sense of justice and propriety, the extent of legislative power in directions in which the constitution had imposed no restraint." (Cooley Const. Lim. 341–342.)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"The rule of law upon this subject appears to be, that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provisions which come within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights." (Cooley Const. Lim. 345–346.)

itself the limitation that it may not so dispose of or appropriate to uses its tidal waters and their bottoms as to interfere with the power and right granted to the United States to regulate and control the navigation thereof, so far as may be necessary for the regulation of commerce with foreign nations and among the States. Further than this there is no limitation to be found in the Constitution of the United States upon the power of the State or of the State legislature to use and dispose of its tidal waters and their bottoms as it may deem proper. To this extent it may, perhaps, be not inept to say that the State holds its tidal waters and their bottoms upon an implied trust for purposes of navigation. But the implication of a trust only serves to becloud the subject. The basic fact is that there is a limitation of power.

The State Constitution is not a grant of powers to the State as a sovereign entity, or in any proper sense a limitation upon its powers as a sovereign entity. Any trust which can be said to be created thereby or to arise therefrom by operation of law, or limitation upon its powers or rights which may appear to be thereby imposed, is revocable by the same power by which the Constitution was ordained, that is, by the people collectively in their sovereign capacity. It, therefore, merely confuses the issue to discuss the rights of the people to the tidal waters and their bottoms from the standpoint of a trust or limitation imposed by the State Constitution on the State as a sovereign entity. Both clarity of thinking and correctness of conclusion will be promoted by coming directly to the real question, which is, has the State legislature the power to take away, destroy or substantially impair the use by the people of the tidal waters or their bottoms for the purpose under consideration? This question in turn must be determined by these two questions: (1) Does the State Constitution expressly or impliedly give or guarantee to the people the right to use them for such purpose? If so, it impliedly denies to

the legislature the power to take away, destroy, or substantially impair such right. (2) Does the State Constitution expressly or impliedly deny to the legislature the power to take away, destroy or substantially impair the use thereof by the people for such purpose? If so, it impliedly gives and guarantees to the people the right to use them for such purpose. The whole question resolves itself into a question of the construction of the State Constitution.

There is nothing primitive about a State Constitution. It is based upon the pre-existing laws, rights, habits and modes of thought of the people who ordained it, and the fundamental theory of sovereignty and of government which has been developed under the common law; and must be construed in the light of this fact. Cooley on Const. Lim. (8 ed.) page 95, 133; *Va. & S. W. Ry. Co.* v. *Clower*, 102 Va. 867, 47 S. E. 1003.

It must also be construed in the light of the purposes for which it was ordained. Cooley Const. Lim. (8 ed.) page 141.

In so far as the sovereignty and governmental powers of the State are concerned the object of the ordination of the Constitution is to provide for the exercise thereof and not the abdication thereof. It would, therefore, be a perversion of the Constitution to construe it as authorizing or permitting the legislature or any other governmental agency to relinquish, alienate or destroy, or substantially impair the sovereignty, or the sovereign rights, or governmental powers of the State. The police power,[2] the power or right of eminent domain,[3] and the power to make, alter and repeal laws[4] are all attributes or inherent and insepar-

---

[2] Cooley Const. Lim. (8 ed.) pages 577 and 1232; Black on Const. Prohibitions, section 72; *Northern Pac. R. Co.* v. *Minn.*, 208 U. S. 583, 28 S. Ct. 341, 52 L. Ed. 630; *Boston Beer Co.* v. *Mass.*, 97 U. S. 25, 33, 24 L. Ed. 989; *Richmond* v. *Va. Ry. & P. Co.*, 141 Va. 69, 90, 126 S. E. 353.

[3] Cooley Const. Lim. (8 ed.) page 575; Black on Const. Prohib. section 72; *Wilburn* v. *Raines*, 111 Va. 334, 68 S. E. 993; *Painter* v. *St. Clair*, 98 Va. 85, 34 S. E. 989.

[4] Cooley Const. Lim. (8 ed.) page 436.

able incidents of sovereignty and the power to govern. For this reason, although no express provision may be found in a State Constitution forbidding the legislature to surrender, alienate, abridge or destroy these powers, there is always such a limitation to be implied from the object and purpose for which the Constitution was ordained. Of course, such sovereign powers must be exercised subject to such limitations upon the exercise thereof by the legislature as are provided in the Constitution.

When we come to consider the powers of the State legislature under the Constitution with reference to the public domain, it is necessary to take cognizance of the two different basic rights which the State has over and in the public domain.

As sovereign, the State has the right of jurisdiction and dominion for governmental purposes over all the lands and waters within its territorial limits, including tidal waters and their bottoms. For brevity this right is sometimes termed the *jus publicum*. But it also has, as proprietor, the right of private property in all the lands and waters within its territorial limits (including tidal waters and their bottoms) of which neither it nor the sovereign State to whose rights it has succeeded has divested itself. This right of private property is termed the *jus privatum*. Farnham on Waters and Water Rights, section 10, section 36a; *Gough* v. *Bell*, 21 N. J. Law 156; *City of Oakland* v. *Oakland, etc., Co.*, 118 Cal. 160, 50 Pac. 277.

The *jus publicum* and all rights of the people, which are by their nature inherent or inseparable incidents thereof, are incidents of the sovereignty of the State. Therefore, by reason of the object and purposes for which it was ordained, the Constitution impliedly denies to the legislature the power to relinquish, surrender or destroy, or substantially impair the *jus publicum*, or the rights of the people which are so grounded therein as to be inherent and in-

separable incidents thereof, except to the extent that the State or Federal Constitution may plainly authorize it to do so. Farnham on Waters and Water Rights, section 10, section 36a; *Illinois Cent. R. Co.* v. *Illinois*, 146 U. S. 387, 455, 13 S. Ct. 110, 36 L. Ed. 1018; *Gough* v. *Bell*, 21 N. J. Law 156. See, also, Greenleaf's edition of Cruise on Real Property, volume 2, page 67, note.

On the other hand, the power of disposition is of the very essence of the proprietary right of the State, its *jus privatum*. Therefore, no implication against the exercise by the legislature of the power or right to alienate and dispose of the lands and waters of the State can arise from the object and purpose for which the Constitution was ordained, except such as arises from the existence and inalienability of the *jus publicum*.

From this; however, necessarily arises this limitation. The legislature may not by the transfer, in whole or in part, of the proprietary rights of the State in its lands and waters relinquish, surrender, alienate, destroy, or substantially impair the exercise of the *jus publicum*. Or, to state it differently, the legislature may not make a grant of a proprietary right in or authorize, or permit the use of, the public domain, including the tidal waters and their bottoms, except subject to the *jus publicum*. This is the only limitation upon the power of the legislature to dispose of any of the public domain, including tidal waters and their bottoms, which exists other than such as are expressly provided by or arise by implication from provisions contained in the State or Federal Constitution. Farnham on Waters and Water Rights, sections 10, 36–36a, 42a–42b, 43–46; *Gough* v. *Bell*, 21 N. J. Law 156; *Langdon* v. *Mayor, etc., of City of New York*, 93 N. Y. 129. See, also, *Illinois Cent. R. Co.* v. *Illinois*, 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018; *City of Oakland* v. *Oakland Waterfront Co.*, 118 Cal. 160, 50 Pac. 277, and concurring opinion of Garoutte,

J., at page 293 of 50 Pac. (118 Cal. 202). See, also, dissenting opinion of Sims, J., in *Darling* v. *City of Newport News*, 123 Va. 14, at page 26, 96 S. E. 307, 310, 3 A. L. R. 748, which on this point is not in conflict with the opinion of the court.

The court in *Illinois Central R. Co.* v. *Illinois, supra,* dwells upon the existence of a trust to the extent that it appears on the surface that it rests its decision upon that point. But an analysis of the case will, we think, show that it has in turn based the existence of a trust upon the view, and that its ultimate holding is, that the right of the people to use the navigable waters of the State for the purposes of navigation is an inherent and inseparable incident of the sovereign governmental power and of the *jus publicum* of the State; and that, therefore, the State Constitution impliedly denies to the legislature the power to deprive them of it or substantially impair it. See, also, *Mobile Transportation Co.* v. *City of Mobile,* 187 U. S. 479, 23 S. Ct. 170, 47 L. Ed. 266.

We are not here considering whether or not the view that the right of navigation is an inherent and inseparable incident of the governmental power and *jus publicum* of the State is a correct view. Nor are we considering to what extent that fact, if it be a fact, operates to limit the power of the legislature to dispose of tidal waters and their bottoms or to authorize, permit, or suffer them to be used for other purposes either private or public. The pertinent point is this: If a claimed limitation upon the power of the legislature to dispose of or permit the use of the tidal waters of the State and their bottoms, or any other part of the public domain, for any purpose, private or public, is not found in some express provision of the State or Federal Constitution, or is not reasonably to be implied from any provision therein, then it has no legal existence, unless to make the disposition or to authorize, permit, or suffer the use in question is to

relinquish, surrender, destroy, or substantially impair the power of the legislature to exercise the governmental powers or *jus publicum* of the State, or the enjoyment by the people of a right which is so grounded therein as to be an inherent and inseparable incident thereof. Or, to state it in the language of the trust doctrine, it may not properly be said that the legislature holds the tidal waters (or any other part of the public domain), upon a trust for the use of the people for any purpose of which it may not divest itself, unless a limitation upon its power to make a disposition of or authorize a use thereof inconsistent with such a trust can be established in one of the three ways indicated in the preceding sentence.

The legislature, of course, owes to the people of the State a most solemn duty to administer the *jus privatum* of the State and to exercise its *jus publicum* for the benefit of the people; but, except as is otherwise expressly or impliedly provided by the Constitution, what is for the benefit of the people is committed to its discretion free from the control or dictation of the executive or judicial department of the government. In this sense it is a trustee for the people of the State; but this is a very different thing from asserting that the legislature holds any part of the public domain in trust for any particular use or for the use by the people in common for any purpose.

This brings us to the question, is the use and enjoyment by the people of the tidal waters and their bottoms for the purpose of taking fish and shellfish therefrom an inherent and inseparable incident of the governmental power, or *jus publicum*, of the State? Upon principle, as well as upon authority, we think it is an incident of the *jus privatum* of the State, not of the *jus publicum*.

It is not unusual for courts and textwriters to speak of both the right of navigation and the right of fishery as natural rights, and to link them together in their

discussions as if they were coordinate rights with no fundamental distinction between the natures of the two rights and the bases upon which they rest. But they are not coordinate rights; they differ fundamentally in their characters and as to the bases upon which they rest. Some courts, however, overlooking these fundamental differences, and without undertaking to account for the origin or existence of the trust other than by declaring that fishery is a "natural right," have said, and a few have held, that the State holds its tidal waters in trust for use both for navigation and fishery.[5] Farnham on Waters and Water Rights, sections 33, 36–38, 43–46, 368–372. See, also, dissenting opinion of Sims, J., in *Darling* v. *Newport News*, 123 Va. 14, at page 26, 96 S. E. 307, 310, 3 A. L. R. 748.

There is much more reason for holding that the right of navigation is so grounded in the *jus publicum* of the State as to be an inherent and inseparable incident thereof and of the governmental power of the State, than there is for holding that this is true of the right of fishery. The right of navigation is the right to move and transport goods from place to place over the great natural highways provided by the navigable waters of the State without let or hinderance from or charge by any private person or corporation. It bears a relationship to the right of liberty, which comprehends the right to move freely from place to place over the public highways; and the right of liberty is declared by the bill of rights of the Constitution of Virginia to be an inalienable right. The duty to provide and

---

[5]In *Illinois Cent. R. Co.* v. *Illinois*, 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018, the attention of the court was directed to the effect of the grant upon navigation, and not to its effect upon fishery. While at page 452 of 146 U. S., 13 S. Ct. 110, 118, the court says that the State holds its tidal waters "in trust for the people of the State that they may enjoy navigation of the waters, carry on commerce over them, and have liberty of fishing therein," the reference to fishery is merely casual and, we think, properly treated as a dictum. This is also true of the reference to the right of fishery in *James River, etc., Co.* v. *Old Dominion, etc., Corp.*, 138 Va. 461, 122 S. E. 344.

maintain highways for the use of its people is a governmental power and duty of which the legislature may not divest the State and cannot exercise without holding the requisite proprietary right in the highway. Even its exercise by an individual partakes in a sense of a public nature for reasons other than that it is a right enjoyed in common.

On the other hand, the right to use the tidal waters and their bottoms for purpose of fishery is not any more an incident of the *jus publicum* than the right to take game in the forest or use the unappropriated uplands for pasturage. In exercising it the individual puts the tidal waters and their bottoms to a public use only in the same sense that the exercise of a common right of pasturage upon unappropriated uplands, or of a common right of fowling upon tidal waters, puts them to a public use. Farnham on Waters and Water Rights, sections 44, 368–372. The particular incident which makes it a public use is the enjoyment thereof in common. Its exercise by the individual converts the public property *pro tanto* to a use which is essentially private, whether it be exercised for pleasure or profit.

There were, at least after Magna Charta, limitations upon the right of the British crown to make grants of private fishery in tidal waters or grants of the bottoms of such waters inconsistent with the exercise by the people of a common right of fishery therein. But these limitations did not extend to the people themselves as represented by the parliament; and in the several States of the United States it has generally been held that the State legislature has the power to make grants of private fishery in tidal waters. Farnham on Waters and Water Rights, sections 36a, 41, 42a, 44, 368a, 370; 11 R. C. L. 1025–1026; 26 C. J. section 21, page 605–607; 60 L. R. A., note page 484 and 490; *Martin* v. *Waddell*, 16 Pet. (U. S.) 376, 410, 10 L. Ed. 997; *Gough* v. *Bell*, 21 N. J. Law, 157; *Wooley* v. *Campbell*, 37

N. J. Law, 163; *Commonwealth* v. *Hilton*, 174 Mass. 29, 54
N. E. 362, 45 L. R. A. 475. In Virginia the legislature has
long exercised the power to grant exclusive private rights
of fishery in its tidal waters by making leases of the bottoms
thereof for oyster planting grounds.[6]

We think that, as has been shown by Farnham
in his able and carefully considered work on Waters and
Water Rights, the right of fishery in tidal waters is an in-
cident of the *jus privatum* of the State, and is not an inherent
and inseparable incident of its *jus publicum;* and that the
State legislature, in the absence of any constitutional pro-
vision on the subject, has the right to take away such right
or authorize, permit or suffer its tidal waters or their bot-
toms to be used for purposes which impair or even destroy
their use for purposes of fishery, and may lease, or sell to
private persons portions of its tidal bottoms with the right
to use them for private purposes to the exclusion of the
use of the waters thereover for purposes of fishery. Or, to
state it in the language of the trust theory, we are of opinion
that the legislature does not hold the tidal waters of the
State or their bottoms upon a trust for the use thereof by
the people for fishery to any extent not provided in the
Constitution itself. Farnham on Waters and Water Rights,
sections 36–38, 41–45a, 46, 368–375, 407; *Gough* v. *Bell*,
21 N. J. Law 157; *City of Oakland* v. *Oakland, etc., Co.*,
118 Cal. 160, 50 Pac. 277, and concurring opinion of Gar-
outte, J., at page 293, of 50 Pac. (118 Cal. 202). See, also,
dissenting opinion of Sims, J., in *Darling* v. *Newport News*,
123 Va. 14, page 26, 96 S. E. 307, 310, 3 A. L. R. 748.

"The common rights in a public fishery are at all times
subject to the disposal of the legislature, and it may deprive

[6]See sections 3223–3228, Michie's Code, Va. 1930, authorizing the assign-
ment and lease to private persons of oyster planting grounds, and restricting
(to some extent) the right of fishery in the waters above such assigned or
leased grounds. Section 3229 provides that if a creek, inlet or cove makes
into or runs through the land of any person, he shall have the exclusive right
to plant oysters or other shellfish therein. See, also, section 3230 providing
for the assignment of private bathing grounds in tidal waters.

the public of the right at its pleasure. This may be done by granting exclusive rights to individuals, or by dealing with the water in such a way that the fishery is destroyed." Farnham on Waters, section 407.

The only section of the Constitution of Virginia which contains any restriction upon the powers of the legislature to dispose of the tidal bottoms of the State and the waters above them is section 175. *James River, etc., Co. v. Old Dominion, etc., Corp.*, 138 Va. 461, 470, 122 S. E. 344. This section reads:

"The natural oyster beds, rocks and shoals in the waters of this State shall not be leased, rented or sold, but shall be held in trust for the benefit of the people of this State, subject to such regulations and restrictions as the General Assembly may prescribe, but the General Assembly may, from time to time, define and determine such natural beds, rocks or shoals by surveys or otherwise."

This section is limited by its own terms to the "natural oyster beds, rocks and shoals;" and the only limitations imposed upon the power of the legislature to dispose of and appropriate them to uses is that they "shall not be leased, rented, or sold, but shall be held in trust for the benefit of the people of this State." The prohibition against leasing, renting, or selling the natural oyster rocks prohibits the legislature from disposing of any of the proprietary rights of the State therein,[7] and, when taken in conjunction with the provision that they shall be held in trust for the benefit of the people of the State, impliedly prohibits the legislature from authorizing, permitting or suffering a *private use* to be made of them, or the bottoms and waters adjacent thereto, which would take away, destroy, or substantially impair the use of the natural rocks by the people for the purpose of taking oysters and shellfish therefrom. But it would be a strained construction to construe

---

[7] But note that it is expressly provided that the "General Assembly may, from time to time, define and determine" the natural oyster rocks.

the section to limit the public use to which the legislature may put any of the natural rocks for the benefit of the people to the propagation and taking of shellfish by them. The reasonable and proper construction of the section is that it relates to private uses and not public uses, and has no application to restrict the power of the legislature to authorize, permit or suffer tidal waters, including those over natural oyster rocks, to be used for any public purpose to which they are at common law subject or the legislature may deem it to be for the benefit of the people to authorize or suffer.

The use of tidal waters for discharge into them of sewage is a public use. See, *Darling* v. *Newport News*, 123 Va. 14, 96 S. E. 307, 3 A. L. R. 748, and *Hampton* v. *Watson*, 119 Va. 95, 89 S. E. 81, 82, L. R. A. 1916F, 189, where the court quotes with approval from *Sayre Co.* v. *Newark*, 60 N. J. Eq. 361, 45 Atl. 985, 48 L. R. A. 722, 83 Am. St. Rep. 629, as follows:

"Indeed the history of sewers shows that from time immemorial the right to connect them with navigable streams has been regarded as part of the *jus publicum;* * * * and whenever tidal streams can conveniently be reached, they have been employed as the medium of discharge to the sea. Such a use of public waters must necessarily entail some defilement. The degree of pollution to be permitted is a matter over which the legislature has full power and control."

Under the common law and by the authority and sufferance, express or implied, of the General Assembly, the cities, towns and communities on Hampton Roads and its estuaries have been exercising the privilege of discharging raw sewage into these waters from the earliest days of the Commonwealth, and long before chemical treatment of sewage was known of as a practical operation. [Hampton v. Watson, 119 Va. 95, 89 S. E. 81, L. R. A. 1916F, 189; Darling v. Newport News, 123 Va. 14, 96 S. E. 307, 3 A. L. R. 748;

*Darling* v. *Newport News*, 249 U. S. 540, 39 S. Ct. 371, 63 L. Ed. 763.

In the last two cases cited it was held that by its charter and by Acts 1908, chapter 349, pages 623, 624, the General Assembly had authorized the discharge by the city of Newport News into Salters creek of the sewage then being discharged thereinto, which was raw, untreated sewage. *Darling* v. *Newport News*, 123 Va. 14, 96 S. E. 307, 3 A. L. R. 748, was decided in 1918. Since then nine sessions of the General Assembly have convened and adjourned without making any provision prohibiting the city from discharging its sewage into these waters or requiring it to treat its sewage before doing so.

By Acts 1914, page 528, chapter 307 (section 3290, Code Va. 1919), it had prohibited the discharge of sewage into Lynnhaven river in order to protect the shellfish therein from pollution; and by Acts 1930, page 327, it prohibited the discharge of sewage into Chuckatuck creek, Urbana creek, Bennett creek, Carter's creek and Milford Haven; but it has not enacted any similar legislation with reference to any of the waters which the bill in this case charges are polluted by the sewage discharged by Newport News.

By Acts 1930, chapter 148, page 357, the legislature authorized the city of Newport News to issue a bond issue for making improvements in its sewage disposal system. The second section of the act reads:

"The proceeds from said bonds shall be used for the construction of a sanitary sewer to Hampton Roads, across lands located beyond the city limits for the prevention of pollution in Salters creek and its adjoining territory, or in the discretion of the council for the acquisition of land inside or outside the city limits and the erection and construction thereon of a sewage disposal plant, for the protection of said creek and territory; and for the acquisition of the necessary lands for either of said purposes, the said city is hereby given the right to exercise the power of

eminent domain for the condemnation thereof, in accordance with the forms prescribed by law for condemnation."

This act clearly recognizes the right of the city to continue to discharge its sewage into Hampton Roads, and in so doing to do either of two things: (1) Construct a sewer line that will discharge into the Roads proper, or (2) erect a sewage disposal plant to treat the sewage before discharging it into Salters creek to flow thence into the Roads. In the light of the former decisions of this court, the long continued and then existing practice of Newport News and of the other cities, towns and communities along Hampton Roads to discharge their sewage untreated into its waters, and the fact that neither this act nor any other expressly or impliedly requires that sewage shall be treated before being discharged into these waters, the act of 1930 must be construed as authorizing Newport News to discharge its sewage into the Roads untreated.

Our conclusion is that the General Assembly has the power to authorize, permit or suffer sewage to be discharged into Hampton Roads and its estuaries, and to subject the discharge of sewage into these waters to no restrictions relative to its injury to fishery therein, or to such restrictions as it may deem proper; that it has authorized and permitted the city of Newport News to discharge the raw, untreated sewage into these waters; and that to what extent these waters may be used for the purpose of sewage disposal, and to what extent they shall be devoted to purposes of fishery, and the restrictions and limitations to be placed on these several uses are questions committed by the Constitution to the discretion of the legislature free from the control or interference of either the executive or judicial department of the government.

It, therefore, follows that the court did not err in sustaining the demurrer and dismissing the bill.

*Affirmed.*