# CIRCUIT COURT OF THE CITY OF NORFOLK

Sarah Harrison

v.

Virginia Marine
Resources Commission
and Ronald W. Boone

March 22, 2007

Case No. (Civil) CL06-1664

BY JUDGE NORMAN A. THOMAS

Pursuant to the provisions of Va. Code §§ 2.2-4025 et seq. and 28.2-1205, the Court will reverse and set aside that portion of the Virginia Marine Resources Commission ("VMRC") January 24, 2006, decision to grant an after-the-fact permit to the respondent, Ronald W. Boone, to retain a second-story bar structure on the Ocean View Fishing Pier. The Court will remand this matter to VMRC with the directive that it issue to Boone an order to dismantle and completely remove the structure from the Ocean View Fishing Pier within ninety days of entry of the final order in this case.

In addition, pursuant to Va. Code § 2.2-4030, the Court finds that the petitioner, Sarah Harrison, having substantially prevailed on the merits of the case is entitled to an award of attorney's fees and costs. In this matter, the agency's position is not substantially justified and no circumstances exist that would make such an award unjust. *See,* Va. Code § 2.2-4630(A). Counsel for Harrison shall submit an affidavit of attorney's fees and costs on or before April 16, 2007. Counsel for the respondents, Boone and VMRC, shall file any exceptions to Harrison's claimed fees and costs on or before April 30, 2007. All counsel are directed to schedule a hearing to occur between May 7 and May 24, 2007, to consider and determine the attorney's fees and costs award to Harrison and to enter a final order in the case.

As the Court will discuss more fully below, the Court finds that the VMRC decision appealed from must be reversed because VMRC failed to observe required procedure which did not constitute harmless error, failed to comply with statutory authority in arriving at its decision, and the agency record lacks substantial evidence to support its decision. *See,* Va. Code § 2.2-4027.

## I. *Background*

On January 24, 2006, VMRC convened to consider Boone's "after-the-fact request to retain a second story twenty-foot by thirty-foot office, and authorization to increase the size of the previously authorized gazebo to fifteen-foot by fifteen-foot and the two previously authorized shelters to thirty-foot by fifteen-foot, all on the Ocean View Fishing Pier adjacent to your property situated along the Chesapeake Bay in Norfolk" (Record 1-1; and see, Record 5-A-2, 7-C-1.) The after-the-fact permit application arose from Boone's efforts to construct the Ocean View Fishing Pier on the site of the former Harrison's Fishing Pier, which Hurricane Isabel destroyed on September 18, 2003. The Ocean View fishing pier lies situate in the 400 block of West Ocean View Avenue of the City of Norfolk, along its Chesapeake Bay coastline, some 1,500 feet in length and covering some 1,368 feet of subaqueous bottomland of the Chesapeake Bay. (Record 5-L-1, 5-N-3.) Pursuant to Va. Code § 28.2-1200, et seq., VMRC possesses jurisdiction over such state-owned submerged bottomlands.

Boone initially commenced construction of the Ocean View Fishing Pier pursuant to Executive Orders 58 and 66, wherein former Governor Mark R. Warner authorized reconstruction of various structures covering state-owned subaqueous lands damaged or destroyed by Hurricane Isabel; those orders encompassed the former Harrison's Fishing Pier. (Record 5-L-1.) As of

May 4, 2004, Boone received VMRC's acknowledgement that he could proceed to "reconstruct a one thousand four hundred ninety-foot long (from mean low water) by sixteen-foot wide open-pile commercial fishing pier with a fifty-foot long by forty-two-foot wide T-section and two sixteen-foot by six-foot boat launch floating docks" upon the site of the former Harrison's Fishing Pier. (Record 5-L-1, 2.) VMRC later clarified that acknowledgement by letter dated September 27, 2004, wherein Robert W. Grabb, VMRC's Habitat Management Chief ("Chief Grabb"), stated that with respect to the T-section of the pier, "the actual dimensions should be fifty-foot long by forty-two-foot wide on both sides of the pier. The entire T-section dimensions may not exceed one hundred sixteen-feet in length by forty-two-feet in width." (Record 5-M.) As Boone planned and commenced construction during 2004 and 2005, he applied for VMRC permits enabling him to construct ancillary structures on and around the new pier. (Record 4-20, 5-A-1 through 5-O-13.) According to Boone, total project costs for pier and pier-related construction, excluding land acquisition, approximated 2.5 million dollars. In December 2004 and January 2005, VMRC approved two permits enabling Boone to build structures on and adjacent to the new pier, including a "one hundred sixteen-foot long by forty-two-foot wide building to house a bait shop, restrooms, a snack bar and recreational room, with a twelve-foot by twelve-foot gazebo structure on the roof, and two twenty-four-foot by sixteen-foot open-sided roofed shelter structures," and "two forty-foot long concrete breakwaters (seven pilings) and an eighteen-foot by forty-foot T-head". (Record 5-F-1 through 5-G.) Boone ultimately placed a large, full service restaurant and bar inside the building, complete with facilities for nightly live bands, DJ's or other entertainment, a dance floor and catering. (Record 4-18, 4-21 through 4-23, 5-I-8, 5-I-9, 5-O-12, 5-O-13, 6-18, 6-19, 6-29 through 6-36, 6-42, 6-44 through 6-48.)

By letter dated July 6, 2005, VMRC's Environmental Engineer, Traycie L. West, wrote to Boone requesting side view drawings of buildings under construction on the pier; VMRC staff originally had requested those drawings in January 2005. (Record 5-G, 5-H.) VMRC staff received those side view drawings on July 18, 2005. (Record 5-I-1.) By letter dated September 7, 2005, Chief Grabb wrote to Boone stating that, "we note that the dimensions of the shelters shown on the recently provided drawings are not consistent with the dimensions of the structures approved by the Commission during their January 25, 2005, meeting. . . . We will be unable to issue your permit for the construction of the building and the shelters or continue with the processing of your modification without submission of the drawings requested in our January 27, 2005, letter." (Record 5-I-1, 5-I-2.) Boone's construction efforts

continued unabated throughout the spring, summer, and fall of 2005. In his July 2005 submission of drawings, Boone, for the first time, indicated an intention to construct an "office" structure on the second story of the one hundred and sixteen-foot by forty-two-foot building previously authorized for construction on the pier, which building is located some three hundred forty feet from mean low water. (Record 4-7 through 4-11, 4-17 through 4-19, and 5-I-7, 5-N-1, 5-O-2.)

On September 23, 2005, Chief Grabb wrote to Boone expressing concern that Boone's building of structures on the pier outside of originally permitted dimensions and apparent intended construction of an un-permitted second floor "office" presented serious concerns to VMRC. (Record 5-J-1.) Indeed, previous VMRC correspondence to Boone repeatedly warned him that construction that deviated from VMRC permits constituted law violations and could result in substantial penalties. (Record 5-F-1, 5-F-3, 5-L-1.) In his September 23, 2005, letter, *inter alia*, Chief Grabb stated in emboldened letters:

> **Please note that this letter only confirms the authorization granted by the Commission at their January 25, 2005, meeting for the construction of the building and shelters as they were presented. This letter does not address, and should not be interpreted as authorization for, the office or change in gazebo and shelter dimensions that you have recently requested. Those items will be considered by the Commission at a future Commission meeting. Proceeding with any construction other than what has been authorized by the Commission or has been determined by staff to qualify for the Governor's Executive Orders concerning structures damaged by Hurricane Isabel will constitute a violation of § 28.2-1203 of the Code of Virginia.**

(Record 5-J-1.)

In addition, West wrote to Boone on October 11, 2005, asking, among other things, for Boone to "please explain the need to place the office on the pier and why it cannot be placed on the adjacent upland." (Record 5-K-1.) Significantly, in a January 4, 2005, letter to VMRC, corresponding with the time frame during which he initially received permits for pier improvements beyond those of the original Harrison's Fishing Pier, and while discussing plans for a second story deck and gazebo for the pier building, Boone stated, "The storage and office building has been deleted

from the scope of work, and room for this will be provided in a building on land." (Record 6-27.) Boone later contended that he did not receive the October 11, 2005, letter, however, upon learning of its contents and when facing VMRC enforcement action regarding the then-already built second story structure, he responded to VMRC by letter dated November 12, 2005. (Record 4-9, 5-E.)

In October 2005, VMRC enforcement personnel saw, from a nearby property, that Boone had completed construction of a second story structure in addition to the approved gazebo. (Record 4-9.) On October 28, 2005, West, in her capacity as VMRC's designated enforcement officer, visited the Ocean View Fishing Pier and officially noted the un-permitted structure. (Record 4-9, 5-C.) West made out a Sworn Complaint against Boone dated November 7, 2005, wherein she certified "that a substantial violation of Chapter 12, Article II, of the Code of Virginia has occurred at the property. . . . I personally inspected the site on October 28, 2005, and noted the following discrepancies: "*an approximately twenty-foot by thirty-foot second story office building has been constructed atop a commercial fishing pier at property located adjacent to the Chesapeake Bay in Norfolk.*" (Record 5-C.) On that same date, Chief Grabb issued to Boone a Notice to Comply. (Record 5-D-1.) That notice ordered Boone to "completely remove" the structure within sixty days or, in the alternative, "to submit a complete written account of the circumstances surrounding the unauthorized construction activities at your pier, including, the names of the persons who performed the work, when the work was accomplished, under whose authority the work was undertaken, and why the additional second story deck was installed in the absence of the required State permit." Grabb demanded from Boone the additional information requested previously by VMRC staff and again notified him of potential substantial penalties whether or not VMRC approved such an after-the-fact permit. (Record 5-D-1 and 5-D-2.)

In his November 12, 2005, reply to the Sworn Complaint and Notice to Comply, Boone acknowledged the unlawful construction of the second-story structure and requested that it be permitted on an after-the-fact basis. (Record 5-E.) Boone also sought after-the-fact VMRC permitting of a temporary construction trestle, an already-constructed fish cleaning station, and an enlargement of the previously permitted gazebo to the dimensions of 16.5 foot by eleven-foot. (Record 2-1, 4-7 through 4-10.) From that time forward, Boone consistently referred to the second-story structure as an office and catering facility. (Record 4-8 through 4-10, 4-18 through 4-20, 5-B-10 through 5-B-13.) However, VMRC staff confirmed and Boone later acknowledged that

the structure constitutes a bar for the sale of alcoholic beverages. (Record 4-8 through 4-10, 4-18 through 4-20, 5-A-4, 5-O-10, 6-19, 7-C-4, 7-C-6; *see also*, Record 6-30 through 6-47, 6-50 through 6-52.)

VMRC originally scheduled a hearing to consider Boone's after-the-fact permit application on December 21, 2005. Yet, Boone, with citizen objectors in attendance on that occasion, requested a continuance to enable him to retain counsel. VMRC agreed to the postponement and took up the matter on its January 24, 2006, hearing docket. (Record 4-1 through 4-30.) At the conclusion of the January 24, 2006, hearing VMRC commissioners voted unanimously to approve each item requested in Boone's after-the-fact permit application, "contingent upon a requirement that you submit a scaled, engineering grade drawing of all as-built structures once the project is completed and your agreement to pay a civil charge of ten thousand dollars in lieu of any further enforcement action." (Record 2-1, 2-2, 4-27 through 4-30, 7-C-1 through 7-C-8.)

## II. *VMRC Hearing of January 24, 2006*

Based upon its investigation, VMRC staff, through West, made a presentation at the outset of the January 24, 2006, evidentiary hearing and stated the following recommendations:

> Although the construction trestle most likely would have been considered a necessary part of the project and garnered a recommendation of approval by staff, the applicant did not request authorization for the installation of that trestle prior to its installation. While evaluating the water dependency of a project, the staff utilizes criteria that was developed by HMAC [Habitat Management Advisory Committee] and approved by the Commission in July of 2003. Those criteria require the staff to consider [the] water dependency definition which is approved by the Commission which is evaluated under two specific questions. Number 1 — Is it necessary for the structure to be located over the water, and, is it necessary for the activity associated with the structure to be over the water. In conclusion, the staff recommends after-the-fact approval of the trestle. In addition, the existing gazebo, although larger than what was authorized should be allowed to remain in place in its current configuration with the consideration of appropriate civil charge. The staff believes that the second-story bar is not water dependent in nature. In addition,

we have not been persuaded this particular amenity can be considered consistent with the amenities typically operated at a community fishing pier facility. Further, it is unlikely that the previous authorizations granted by the Commission for the shelters, [sic] the second-story bar is not an amenity similar to what was previously authorized at the former Harrison Fishing Pier, and is not in keeping with the Agency's public trust responsibilities. The staff recommends removal of the second-story bar [in] its entirety [within] sixty days. Lastly, the staff recommends that the Commission require Mr. Boone to submit scaled, engineer grade drawings of the as-built pier once it is complete. This will assist staff in assessing future permit compliance once the total project has reached completion.

(Record 4-10 and 4-11; *see also* Record 4-1; clarifications added.) The recommendation West read was that of the Habitat Management Division of VMRC. (Record 1-1 through 1-4.)

Pursuant to Va. Code § 28.2-1205(B), the Virginia Institute of Marine Science also conducted an investigation and provided VMRC with recommendations regarding Boone's after-the-fact permit application. (Record 5-N-1 through 5-N-5.) In relevant part, referring to the second-story bar, that organization stated, "We maintain our previous comments that the siting of non-water dependent structures over subaqueous bottom is undesirable from a marine environmental perspective." (Record 5-N-2.)

At the outset of the January 24, 2006, hearing, Harrison requested a continuance so that she might hire counsel to represent her and other objectors to Boone's after-the-fact permit application. VMRC considered and denied that request, noting that Harrison already had enjoyed adequate time to hire counsel. (Record 4-5 through 4-7.) Ms. West then presented an overview of the entire Ocean View Fishing Pier project and discussed the Habitat Management Division's investigation and its above-noted recommendations. (Record 4-7 through 4-11.) In response to an associate commissioner's question, Ms. West noted that the former Harrison's Fishing Pier constituted a one-story structure. (Record 4-11.)

VMRC then heard from Boone's counsel and received witness testimony on his behalf. (Record 4-11 through 4-21.) Counsel made the following proffer ostensibly on behalf of Paul D. Fraim, Norfolk's mayor:

Mayor Paul Fraim was here earlier and unfortunately when we took a break he had another commitment he had to be there for. I have his permission to make a representation of what his remarks

would be if that is okay with the commission to do that. Mayor Fraim indicated that he wished to tell this commission that the City Council held extensive public hearings before enacting the ordinances that authorized the conditional use permits that would allow them to have these facilities, on the pier – the restaurant, etc.; that they also consider this an important part of the revitalization of the Willoughby section of Ocean View and the City of Norfolk; that at no time during their consideration did they believe that this structure that is in question that's on top was anything other than an entertainment structure that's what they've always known it would be and always believed it would be a catering and entertainment facility. They, the City Council, unanimously approved the project by passing the ordinances allowing the conditional use permits and the Mayor believes that this facility would greatly enhance the ability of the citizens of Norfolk and the rest of the state to enjoy the Chesapeake Bay by being able to have a place where they can sit on this pier, where they can – it's open to the public – anybody that wants to come in – it's a restaurant, it's licensed by the ABC Board, it's also available for renting out for private functions to anybody that wants to do that, for weddings, etc.

(Record 4-12.)

Boone then called three witnesses and, following their testimony, himself testified. First, Anthony J. DeFillipo, president of the Norfolk Convention and Visitor's Bureau, in general, spoke quite favorably about the Ocean View Fishing Pier project. When asked specifically about the second-story bar structure, DeFillipo gave a largely unresponsive answer. (Record 4-14 and 4-15.) However, his comments clearly favored utilizing the second-story observation deck of the pier structure for overlooking the water and catered events. (Record 4-15.)

Boone next called Peter Decker, an attorney practicing in Norfolk and a member of the law firm representing Boone before the VMRC. (Record 4-15 and 4-16.) Decker testified favorably regarding the Boone family's contribution to revitalizing the Ocean View area of Norfolk. With respect to the second-story bar structure, Decker stated, "We are talking about this catering center/bar/office – whatever it is it's necessary on that deck . . . the citizens are going to be enjoying the Chesapeake Bay from up there – that's what it's all about – so it is necessary." (Record 4-15 and 4-16.) Jerry Ramsey, a Boone employee, also testified and spoke well of the Boone family and in

particular of respondent Boone. (Record 4-16 and 4-17.) He expressed admiration for the Ocean View Fishing Pier project, yet did not specifically address the second-story bar structure.

Boone testified and, at the outset, stated that, "I never, ever once did anything out of malice or meanness or to harm the environment or to harm anybody when building this thing." (Record 4-17.) With respect to his previous efforts to characterize the second-story bar structure as an "office," Boone stated, "The bar is where I do my paperwork up there, I am going to put something in there where I can get up and out of the way of all the fishermen that come in[.]" (Record 4-18.) As to the bar's service at a catered function, he stated, "the Health Department makes me have a covered area for my catering facility, otherwise, I have to construct a little tent every time that I have to do something. I don't want to necessarily have to do that. I'd like to have something pretty and permanent and not that's going to falter when the weather is bad and when it's windy." (Record 4-18.) He went on to describe a number of the first-floor amenities of the pier's large building, including a large full service bar and restaurant with facilities adequate for large-scale catered events. (Record 4-18.) On the issue of having built structures larger than permitted and an un-permitted second-story structure, Boone apologized and, in part, stated "I had my cranes out there – the large cranes out there they're costing thousands of dollars a day and all my siding guys. I know this is not an excuse, but I'm just telling you why I did this . . . it's hundreds and hundreds of dollars a day to have these siding guys out there and the roofing guys and I just put it all together and had figured . . . it may have been approved[.]" (Record 4-18.)

During the ensuing questioning by VMRC members and staff, Boone suggested that the second-story structure, which he clearly acknowledged was a bar, may assist him in retiring the capital costs of pier construction. (Record 4-20.) However, Boone offered no financial or other data to support that intimation. Former VMRC associate commissioner Garrison at one point asked Boone a question respecting the time period between VMRC's January 2005 requests for pier drawings and Boone's long-delayed responses. (Record 4-19.) Mr. Garrison prefaced that question with the phrase, "I'm on your side."

In so stating, former associate commissioner Garrison expressed a clear and inappropriate bias in favor of Boone. At that point in the hearing, neither Harrison nor any other objector to the after-the-fact permit application had spoken or otherwise submitted evidence. At the conclusion of all the evidence, Garrison went on to make a motion in favor of Boone's application and stridently argued for it. (Record 4-27 through 4-29.) Such

events clearly taint the hearing process. Although the Court will not here belabor the point, no VMRC member should ever sit in any matter wherein he or she cannot consider and decide the issues with complete impartiality and fairness. To do otherwise would constitute a denial of due process to the involved persons.

In opposition to the after-the-fact permit application, both Harrison and Bennie LeBon testified. (Record 4-21 through 4-24, 4-26.) Both individuals identified themselves as property owners and residents of the four hundred block of West Ocean View Avenue in Norfolk, the same block as that of the Ocean View Fishing Pier.[1] Harrison lodged numerous complaints about the pier, the process of its various regulatory approvals before the City of Norfolk and the Virginia Alcoholic Beverage Control Board, and the alleged brazenness of Boone, his family, and business interests in constructing pier improvements contrary to the limitations of VMRC-issued permits. The respondents correctly argue that many of Harrison's comments related to matters either not before VMRC or long-since determined by issuance of Boone's previous permits. However, in her testimony, Harrison made reference to the effects on her property of the second-story bar structure and to the substantially different representations Boone made to VMRC respecting the proposed uses of that structure and those he made to Norfolk city officials and the Virginia Alcoholic Beverage Control Board. (Record 4-22 through 4-24.) She particularly objected to noise generated from activities undertaken on the second-story deck of the pier's main building. (Record 4-23 and 4-24.)

LeBon testified to the significant difference between the structures and activities on the former Harrison's Fishing Pier and the new Ocean View Fishing Pier. (Record 4-22.) As to the after-the-fact permit application, he

---

[1] Harrison and the respondents differ on the distance between her property and the pier. At one point during the hearing she described her residence as, "Approximately ten houses west of this pier project." (Record 4-6.) On brief to this Court, and with some reference to excerpts of area maps contained in the record, she argues the distance at approximately five hundred feet. *See*, Plaintiff's Reply Brief, page 2; and *see* (Record 6-39, 6-40 and 6-43, 6-81, 6-82, 6-84, 6-98 and 6-99.) The respondents utilize the same materials within the record to argue the distance at eight to nine hundred feet. *See, e.g.*, Response Brief of Defendant Virginia Marine Resources Commission, page 10. From this record, the Court cannot determine the precise distance between Harrison's property and the Ocean View Fishing Pier. Each of the map sources contained in the record represent photocopies of other materials which either do not contain information as to their scale or, if they do, the Court cannot tell if the photocopy represents an enlarged or reduced view of the original document.

specifically objected to the second-story structure blocking his sunrise view over the Chesapeake Bay: "I can no longer see that sunrise in the morning until the sun gets over top of the building – it's right directly in my path when the sun comes up. I'm sure that's the same for my other neighbors." (Record 4-26.) LeBon also expressed concerns about matters not apposite to the VMRC hearing. (Record 4-26.)

Upon concluding her testimony, Harrison offered a packet of documents and items to which she had made reference during her testimony. (Record 4-24.) VMRC's presiding commissioner accepted those materials into the record; Boone did not object to them. (Record 4-24.) Those exhibits comprise Section 6 of the VMRC record and, although some duplicate pages exist, they consist of one hundred and five pages. (Record 6-1 through 6-105.) Notwithstanding their receipt, the VMRC record of proceedings on January 24, 2006, demonstrates that at no time did VMRC commissioners pause to consider any portion of these exhibit items. (Record 4-24 through 4-30.) Instead, upon receiving them into the record, VMRC heard briefly from Boone and LeBon and then immediately commenced its discussion leading to approval of the permit application. (Record 4-24 through 4-27.)

When the presiding commissioner announced to VMRC members that the "matter is before the commission," former associate commissioner Garrison immediately made motion to grant the permit, which motion received a second. (Record 4-27.) During VMRC deliberations, Chief Grabb pointed out the difference between a part-time catering operation and a bar that would be in service seven days a week throughout warm weather seasons of the year and asked Garrison whether he would be "willing to entertain that the bar be used only for catering on the upstairs level?" (Record 4-27; *and see*, Record 4-20.) Garrison rejected that amendment, stating, "the City doesn't have a problem with it so I don't see why we should." (Record 4-28.) Indeed, VMRC declined completely to consider whether adjacent or nearby properties would be affected by granting the after-the-fact permit application, deferring completely on that issue to the City of Norfolk's process of granting zoning special exceptions to Boone with "some restrictive covenants on the use of the property, hours of operation, etc." (Record 4-28; *and see*, Record 4-29.)

The balance of VMRC deliberations included discussion of the Ocean View Fishing Pier's amenities in general; they did not focus on the specifics of the applied-for after-the-fact permit. (Record 4-28 through 4-30.) Ultimately, VMRC voted to grant the after-the-fact permit, conditioned upon Boone's payment of a $10,000.00 civil penalty and provision of accurate as-built drawings. Garrison did accept an amendment to raise the penalty from the originally proposed amount of $5,000.00, based on other VMRC

commissioners' concerns with Boone's original characterizations of the second-story structure as an office and catering facility as opposed to a bar. (Record 4-28 through 4-30.)

### III. *Issues Presented*

In her petition for appeal, Harrison presents the following issues:

1. Whether VMRC erred by granting Boone permits beyond Executive Orders 58 and 66, thus enabling him to construct a pier that exceeded the dimensions of the former Harrison's Fishing Pier?

2. Whether VMRC erred by granting a permit in violation of Tile 28.2 of the Virginia Code, and specifically, Va. Code § 28.2-1205(A)?

3. Whether VMRC erred in granting Boone a permit under circumstances wherein Boone deliberately exceeded the scope of previously granted permits?

4. Whether VMRC violated the public trust doctrine in granting Boone a permit for non-water dependent structures upon the Ocean View Fishing Pier?

5. Whether VMRC erred in granting a permit to Boone wherein it failed to specify royalties due the Commonwealth pursuant to Va. Code § 28.2-1205(E)?[2]

Boone and VMRC deny error and, in addition, oppose Harrison's contentions on the following grounds:

1. That Harrison lacks standing to pursue this appeal as she does not constitute a "person aggrieved" within the purview of Va. Code § 28.2-1205(F);

2. That Harrison inadequately preserved issues for appeal at the January 24, 2006, VMRC hearing and inadequately articulates her assigned errors for purposes of judicial review pursuant to Va. Code § 2.2-4027 and Rules 1:4(d) and 2A:4 of the Rules of the Supreme Court of Virginia;

3. That Harrison is time barred from appealing any aspect of a VMRC permit action that predated its granting of Boone's after-the-fact permit application;

---

[2] In stating the issues Harrison presents, the Court condenses them to some extent from their original presentation in the Petition for Appeal. Some of Harrison's alleged errors were inclusive, or redundant, of others, thus requiring the Court to consolidate them for restatement in this letter-opinion.

4. That Virginia courts lack jurisdiction to review any VMRC decision made pursuant to the public trust doctrine.[3]

## IV. *Summary Decisions*

The Court agrees with the respondents that Harrison may not challenge any VMRC decision on appeal other than its granting of Boone's after-the-fact permit application. Boone's previous permits dating from December 2004 and January 2005, several months prior to his November 2005 after-the-fact permit application, constitute final, unreviewable decisions. To permit Harrison to complain now about the scope of those permits would violate Rule 2A:2 of the Rules of the Supreme Court of Virginia.

The Court also summarily resolves Harrison's contention that VMRC erred in not specifying royalties owed to the Commonwealth. As the respondents point out, the pier structures at issue in Boone's application do not involve coverage of subaqueous lands beyond the footprint of the earlier-permitted pier dimensions, thus representing no additional "use" or removal of subaqueous land or materials for the purpose of calculating royalties. *See*, Va. Code §§ 28.2-1205(E), 28.2-1206 and the VMRC's *Subaqueous Guidelines*, Section I(E) (November 2005 Ed.). (Record 8-8, 8-22.)

In addition, the Court finds that Harrison fails in her claim that VMRC lacked authority to permit the Ocean View Fishing Pier to exceed the dimensions of, or otherwise expand upon, the footprint of the former Harrison's Fishing Pier. While the parties apparently agree that Executive Orders 58 and 66 enabled individuals to reconstruct or build replacements for piers and other structures damaged or destroyed by Hurricane Isabel, Harrison presents no authority limiting VMRC's authority to grant permits to expand or enlarge upon those pre-September 18, 2003, uses. Va. Code § 28.2-1200 et seq. generally delegates to VMRC authority to exercise jurisdiction over state-owned submerged lands, including to issue permits for reasonable uses thereof. *See*, Va. Code §§ 28.2-1204 and 28.2-1205; *see also*, Va. Code § 28.2-101. Thus, although this Court finds that VMRC committed error, its actions herein did not violate any scope limitations relating to Executive Orders 58 and 66.

---

[3] Once again, resulting from the nature of the respondents' replies to Harrison's contentions in the responsive pleadings, the Court herein condenses the respondents' affirmative defenses from their originally-stated forms.

Moreover, the Court concludes that VMRC possesses adequate legislative authority to exercise discretion in a given case, such as this one, to consider an after-the-fact permit application and to impose a civil penalty in lieu of seeking redress through criminal prosecution of an individual allegedly in violation of Va. Code § 28.2-1203. *See,* Va. Code §§ 28.2-1210 through 28.2-1213. Pursuant to its authority under Va. Code § 28.2-1200, et seq., VMRC traditionally considers after-the-fact permit applications for use of state-owned submerged lands; Harrison presents no authority or arguments sufficient to challenge its basic authority to do so. *See, Subaqueous Guidelines,* Section I (November 2005 Ed.); and, *see generally, Palmer v. Virginia Marine Resources Commission,* 48 Va. App. 78, 628 S.E.2d 84 (2006), and *Evelyn v. Virginia Marine Resources Commission,* 46 Va. App. 618, 621 S.E.2d 130 (2005) (involving litigation respecting VMRC consideration of after-the-fact permit applications).

The Court disagrees with respondents that Harrison failed to adequately preserve at the January 24, 2006, hearing the issues which she presses upon appeal or that her petition for appeal fails to adequately notify them of her complaints. True, Harrison, then *pro se*, did not articulate her complaints with legal precision at the hearing. However, the content of her testimony and that of her called witness, LeBon, as well as the content of the exhibits she introduced, adequately state concerns with the situs on the pier and activities associated with, in particular, the second-story bar structure, and how that structure and those activities allegedly would negatively affect her and her fellow neighbors' enjoyment of their residential properties. *See, e.g.,* (Record 4-21 through 4-24, 4-26, 6-1 through 6-105.) These articulations included complaints about disturbing noise and blocked view of Chesapeake Bay vistas and included corroboration thereof. Thus, the VMRC record and the petition for appeal adequately meet the specificity standards of Va. Code § 2.2-4027 and Rules 1:4(d), 2A:2, and 2A:4 of the Rules of the Supreme Court of Virginia, as well as established Virginia precedent on the subject. *See, Ted Lansing Supply v. Royal Aluminum and Construction Corp.,* 221 Va. 1139, 277 S.E.2d 228 (1981); *Potts v. Matheison Alkali Works,* 165 Va. 196, 181 S.E. 521 (1935). *Cf., City of Norfolk v. Vaden,* 237 Va. 40, 375 S.E.2d 730 (1989).

Finally, with respect to her complaints about Boone's after-the-fact permit, it appears clear to this Court that Harrison's target is the second-story bar structure. Both on brief and at oral argument, through counsel, Harrison focused almost exclusively upon this structure and not the temporary trestle, fish cleaning station, or the open-sided shelters and gazebo that Boone built to somewhat larger dimensions than originally permitted. The Court concludes

from these facts that Harrison does not genuinely pursue reversal of VMRC on the other items included in the permit application. The construction trestle was, by its very nature, temporary, and, although the record does not clearly express it, the trestle now appears to have been removed from the vicinity of the Ocean View Fishing Pier. The enlarged fishing shelters were constructed along the length of the pier well beyond the building on which the second-story bar structure rests. The gazebo is an open sided structure on the second story of the pier's main building and Boone built it with dimensions covering approximately one hundred eighty-one square feet; VMRC originally permitted the structure at one hundred forty-four square feet. The Court accordingly will concentrate its decisional attention on the second-story bar structure.

## V. *Standing*

The Court rules that Harrison constitutes a "person aggrieved" by the VMRC decision pursuant to Va. Code § 28.2-1205(F), and therefore is entitled to the judicial review that she seeks herein. Indeed, Va. Code § 28.2-1205(A)(4) requires that, "The Commission shall also consider the project's effect on the following . . . adjacent or nearby properties." Harrison's residential property, recently assessed by the City of Norfolk at a total value of $345,700.00, lies situate in the *same* block as the Ocean View Fishing Pier. *See*, (Record 6-99.) The Court need not determine the precise distance between her residence and the foot of the pier or any point along its several hundred foot length. She enjoys a statutory mandate to VMRC consideration of the project's effect on her property, as it clearly falls within the category of "adjacent and nearby properties."

In *Virginia Beach Beautification Commission v. Board of Zoning Appeals*, 231 Va. 415, 419, 344 S.E.2d 899, 902 (1986), the Court defined the term "aggrieved" for standing purposes:

> The term "aggrieved" has a settled meaning in Virginia when it becomes necessary to determine who is the proper party to seek court relief from an adverse decision. In order for a petitioner to be "aggrieved" it must affirmatively appear that such person had some direct interest in the subject matter of the proceeding that he seeks to attack. *Nicholas v. Lawrence*, 161 Va. 589, 592, 171 S.E. 673, 674 (1933). The petitioner "must show that he has an immediate, pecuniary, and substantial interest in the litigation, and not a remote or indirect interest." *Id.* at 593, 171 S.E. at 674.

Thus, it is not sufficient that the sole interest of the petitioner is to advance some perceived public right or to redress some anticipated public injury when the only wrong he has suffered is in common with other persons similarly situated. The word "aggrieved" in a statute contemplates a substantial grievance and means of denial of some personal or property right, legal or equitable, or imposition of a burden or obligation upon a petitioner different from that suffered by the public generally. *Insurance Association v. Commonwealth*, 201 Va. 249, 243, 110 S.E.2d 223, 226 (1959).

*Cf., discussion, State Water Control Board v. Crutchfield*, 265 Va. 416, 426-29, 578 S.E.2d 762, 767-68 (2003).

Harrison presents as a riparian owner along the Chesapeake Bay shoreline in close proximity to the Ocean View Fishing Pier. Among other things, she complains about the noise and activities associated with the second-story bar structure at issue in the after-the-fact permit application and presented evidence from her next door neighbor, LeBon, to the effect that the second-story bar structure blocks an additional portion of area residents' sunrise views over the bay. Such complaints represent issues wholly different in kind and character from virtually all other persons vis-à-vis the pier.

Therefore, applying the *Virginia Beach Beautification* standard and in light of the applicable statutory language, Harrison possesses standing to maintain this appeal.

## VI. *VMRC Procedural Error*

The Virginia statutes providing for VMRC hearings to consider contested issues respecting the granting of permits, including permits for the use of state-owned bottomlands, do not express in specific detail the procedures to follow. *See,* Va. Code § 2.2-4001 (defining the word "hearing"); Va. Code § 2.2-4020 (providing for formal hearings on litigated issues); *and,* Va. Code § 28.2-1205 (prescribing the numerous considerations required as requisites for granting permits to use state-owned bottomlands). However, their terms collectively establish a framework to ensure procedural due process of law to both the proponents and opponents of a given permit application. In conducting formal hearings to litigate such contested issues, VMRC sits in a deliberative capacity and exercises quasi-judicial powers delegated directly to it by the General Assembly.

Virginia's courts, in turn, exercise appellate judicial authority to review the outcome of such administrative proceedings. *Palmer v. VMRC*, 48 Va. App. 78, 85, at n. 4, 628 S.E.2d 84, 88, at n. 4 (2006). *And see*, Va. Code §§ 2.2-4026, 2.2-4027, and 28.2-1205(F); *and*, Rule 2A:1 et seq. of the Rules of the Supreme Court of Virginia. The appellate process includes judicial review of both substantive and procedural elements of administrative proceedings as outlined in Va. Code § 2.2-4027.

Va. Code § 2.2-4027 includes a sub-section requirement enabling a court to review an agency's "observance of required procedure where any failure therein is not mere harmless error." An agency's failure to meaningfully provide procedural due process to any litigant can constitute harmful error and result in a proper ground for reversal of its administrative decision. *Virginia Board of Medicine v. Fetta*, 244 Va. 276, 281, 421 S.E.2d 410, 413 (1992).

In this case, Harrison introduced into the VMRC record over one hundred pages of material and a CD sound recording which the commission received without objection and took no time to consider. (Record 4-24, 4-27 through 4-30.) Upon review, this Court, having reviewed the text of Harrison's submitted documents and listened to the CD recording, concludes that VMRC's failure to consider them constitutes harmful error in its decisional process, resulting in a denial of constitutionally guaranteed and statutorily mandated procedural due process to Harrison.

Indeed, had VMRC reviewed the materials, it would have found numerous sources of corroboration for Harrison's relevant contentions. (Record 6-1 through 6-105.) For example, the materials demonstrate that Harrison is not alone in complaining about the effects on nearby residential properties of over-the-water, late-night noise emanating from activities associated with the second-story bar structure. (Record 6-1 through 6-5, 6-53 through 6-80, 6-100 though 6-105.) As noted above, the materials include a CD containing a sound recording, and detailed specifications of the equipment utilized to record it, of such noise. Also, the materials document that, during the summer and fall of 2005, when Boone disregarded repeated VMRC requests for information about and drawings of the structures built on the pier, and later provided information inaccurately characterizing the second-story structure as an "office and catering" facility, he was actively and vigorously touting the structure to Norfolk city officials and the Virginia Alcoholic Beverage Control Board as a bar and an entertainment "Hot Site." *See*, (Record 6-18, *6-19*, 6-21, 6-24 through 6-52.)

Thus, the Court rules that Harrison establishes a VMRC failure to observe required procedure when such "failure therein is not mere harmless error." Va. Code § 2.2-4027(iii).

## VII. *Compliance With Statutory Authority*

The terms of Va. Code § 28.2-1205(A) set forth the factors for VMRC consideration when "determining whether to grant or deny any permit for the use of state-owned bottomlands." Those provisions include the following things:

The Commission shall be guided in its deliberations by the provisions of Article XI, Section I, of the Virginia Constitution.[4]

The Commission must consider the public and private benefits of the proposed project.

The Commission must exercise its authority regarding permit applications "consistent with the public trust doctrine…in order to protect and safeguard the public right to the use and enjoyment of the subaqueous lands of the Commonwealth held in trust by it for the benefit of the people."

The Commission must consider other specific categories of factors, if applicable to a particular permit application, including, "the project's effect on . . . adjacent or nearby properties." A fair reading of the statutes' enumerated factors reveals that, with respect to a given permit application, only some of those factors may apply. *See, Palmer v. VMRC*, 48 Va. App. 78, 90, 628 S.E.2d 84, 90 (2006).

When one or more of the enumerated factors apply to a given permit application, the statute mandates that VMRC "shall" consider the project's effect vis-à-vis that factor. In other words, the statute requires VMRC to consider the factor and its language does not allow VMRC to abdicate such consideration or delegate it to local, municipal, or other public authorities. For example, as stated by respondent VMRC at page 7 of the Response Brief of Defendant Virginia Marine Resources Commission, "Zoning issues are

---

[4] Article XI, Section I, of the Virginia Constitution states, "To the end that the people have clean air, pure water, and the use and enjoyment for recreation of adequate public lands, waters, and other natural resources, it shall be the policy of the Commonwealth to conserve, develop, and utilize its natural resources, its public lands, and its historical sites and buildings. Further, it shall be the Commonwealth's policy to protect its atmosphere, lands, and waters from pollution, impairment, or destruction, for the benefit, enjoyment, and general welfare of the people of the Commonwealth."

matters for local governments and are not within the Commission's jurisdiction." Respondent Boone wholly adopted VMRC's positions on brief at page 1 of the Response Brief of Defendant Ronald W. Boone. Nevertheless, at the January 24, 2006, hearing, VMRC's commissioners declined to independently consider the effects of the second-story bar structure on adjacent and nearby properties. Instead, VMRC chose to defer to the City of Norfolk's process of granting zoning special exceptions to Boone respecting pier operations. (Record 4-25, 4-27 through 4-28.) The Court holds that such abdication constituted failure to comply with statutory authority within the meaning of Va. Code § 2.2-4027(ii) and, just as did the procedural due process denial discussed above, such error warrants reversal of VMRC's January 24, 2006, decision.

To tangibly illustrate the point, consider that one of Harrison's relevant objections focused on over-the-water noise emanating from activities associated with the second-story bar structure. A review of Section 6 of the VMRC record indicates that Norfolk zoning officials and, in turn, its City Council, mainly focused municipal concerns with noise problems on the hours during which live bands or DJ's may perform on the second-story deck, and generally sought to require pier operations to comply with Chapter 26 of the Norfolk City Code, by which unduly loud noise constitutes a criminal, Class 2 misdemeanor offense. (Record 6-30 through 6-35, 6-44 through 6-47.) While municipal zoning officials, and their attendant police power based processes, may well overlap to some extent with VMRC consideration of noise-related issues, VMRC consideration of the effect of such noise on "adjacent or nearby properties" may well include other, different sub-issues and perspectives. Indeed, the VMRC deliberative process of statutorily enumerated factors takes place against the backdrop of balancing the project's "public and private benefits" and the application of both constitutional and public trust doctrine considerations. See, Va. Code § 28.2-1205(A). Thus, the statute requires that VMRC independently consider applicable enumerated factors notwithstanding the fact that local municipal or other state agencies might consider substantially similar or even some of the same matters in their decision making processes. See, Evelyn v. VMRC, 46 Va. App. 618, 633, 621 S.E.2d 130, 138 (2005), (wherein the Court made clear that, while local governments may possess regulatory interests respecting a pier, "VMRC is the body to which the General Assembly has assigned the task of protecting the public's interests" in state-owned subaqueous lands.)

For example, Va. Code § 28.2-1205(B) requires VMRC to "consult with other state agencies" such as the Virginia Institute of Marine Science, "whenever the Commission's decision on a permit application relates to or

affects the particular concerns or activities of those agencies." Thus, while the commission properly considers the position or recommendations of such state agencies, it may not abdicate its ultimate responsibility to deliberate upon a relevant issue or factor by completely deferring to such agencies. Likewise, while VMRC may take note of local government zoning or other administrative agency decisions, pursuant to the language of Va. Code §28.2-1205(A), it may not completely defer to them on a factor enumerated therein. *See, Evelyn,* 46 Va. App. at 624, 621 S.E.2d at 133 (2005) (noting that on issues of law, courts possess special competence and need not defer to an agency's decision making as otherwise would be required pursuant to Va. Code § 2.2-4027.)

## VIII. *The Public Trust Doctrine*

A critically important responsibility placed upon VMRC in its consideration of a permit for use of subaqueous lands is the requirement to "exercise its authority under the section consistent with the public trust doctrine." Va. Code § 28.2-1205(A). That doctrine arises from the fact that the Commonwealth holds title to all state-owned bottomlands "in trust . . . for the benefit of the people." *Id.* In its regulations, VMRC adopts a correct, summary definition, as follows:

> In short, the Public Trust Doctrine is the principle that the state holds the land lying beneath public waters as trustee for the benefit of all citizens. As trustee, the state is responsible for proper management of the resource to ensure the preservation and protection of all appropriate current and potential future uses, including potentially conflicting uses, by the public.

(Record 8-4, *quoting, Subaqueous Guidelines,* Section I, "Introduction" (November 2005 Ed.)). *See also, discussion, Palmer v. VMRC,* 48 Va. App. at 88-89, 628 S.E.2d at 89-90.

The public trust doctrine, emerging in modern times as a concept of the common law as developed from Magna Charta times, and based originally on principles of Roman law, both recognizes that title to subaqueous lands belongs to the Commonwealth, as successor to the British Crown, and yet, the state, as a sovereign government by and for its people, possesses those lands in a trustee-like capacity for the use and benefit of the public. The leading U.S. Supreme Court decision defining the public trust doctrine, *Illinois Central RR. v. Illinois,* 146 U. S. 387 (1892) held, *inter alia,* that a state government may

not exercise its title over submerged bottomlands in a manner that fails to preserve those lands and the waters covering them for the benefit of the public. *Id.*, at 452-53. Modern discussions of the public trust doctrine in Virginia may be found within the following resources: Linda L. Butler, Article: "The Commons Concept: A Historical Concept With Modern Relevance," 23 William & Mary L. Rev. 835, 881-99 (1982); Sharon M. Kelley, Note: "The Public Trust and the Constitution: Routes to Judicial Overview of Resource Management Decisions in Virginia," 75 Va. L. Rev. 895, 900-16 (1989); and Daniel Summerland, Note: "Improving Public Access to Coastal Beaches: The Effect of Statutory Management and the Public Trust Doctrine," 20 William & Mary Envtl. L. & Policy Rev., 425-30 (1996).

Although some twentieth century Virginia Supreme Court precedent exists criticizing the nomenclature and analytical accuracy of the public trust doctrine as a genuine "trust" relationship between the state and its people, the General Assembly clearly adopted the doctrine in its delegation of permitting authority to VMRC with respect to state-owned bottomlands. *See, discussions, Commonwealth v. City of Newport News*, 158 Va. 521, 531-53, 164 S.E. 689, 691-99 (1932).

Va. Code § 28.2-1205(F) makes clear that, "any decision made by the Commission hereunder consistent with the public trust doctrine as defined by the common law of the Commonwealth adopted pursuant to § 1-200 shall not be deemed to have been made pursuant to the police power." In so stating, the General Assembly draws the distinction between VMRC's actions pursuant to the Commonwealth's status as holding *title* to subaqueous lands, albeit the title of a fiduciary, and actions by the Commonwealth or local governments that affect the use of private property on behalf of public safety, health, and welfare considerations. *See, e.g., Weber City Sanitation Commission v. Kraft*, 196 Va. 1140, 1148, 87 S.E.2d 153, 158-59 (1955), *and, Bowman v. Virginia State Entomologist*, 128 Va. 351, 361-62, 105 S.E. 141, 144-45 (1920), (discussing the nature of the police power). Thus, in granting permits for use of subaqueous lands, VMRC, by virtue of authority granted to it by the General Assembly, acts as an owner of those lands and does not thereby merely impose regulation upon private property rights.

In this case, the respondents argue that, when VMRC acts pursuant to the public trust doctrine, it acts on behalf of the Commonwealth in a "proprietary capacity," and that Virginia courts lack jurisdiction to review such action. *See*, Answer of the Virginia Marine Resources Commission to the Petition for Appeal, pages 7 and 8; Response Brief of Defendant Virginia

Marine Resources Commission, pages 4 through 7. Thus, in its analysis of VMRC compliance with the public trust doctrine in this case, the Court will turn first to the respondents' jurisdiction-based contentions.

The respondents' position largely ignores both recent precedent on the issue of judicial review of VMRC decisions regarding subaqueous land use permits and the holistic statutory scheme of required VMRC considerations as codified in Virginia Code § 28.2-1205(A). As noted above, that statutory scheme requires VMRC to consider the public trust doctrine within the context of numerous other constitutional and statutorily-based factors. To argue that VMRC decisions pursuant to the public trust doctrine are "unreviewable" by the judiciary serves only, in effect, to beg the ultimate question regarding whether VMRC, in a given case such as this one, correctly followed the principles of the public trust doctrine within the context of the entire statutory scheme.

As to recent precedent, in *Evelyn v. VMRC*, 46 Va. App. at 631, n. 3, 621 S.E.2d at 137, n. 3, the Court specifically defines the judiciary's role in providing appellate review of VMRC decisions and its consideration of the public trust doctrine. In relevant part, the Court stated:

> Thus, the Constitution makes clear it is entirely appropriate for the VMRC and judiciary to consider the legislature's expressed duty to "safeguard the public right to the use and enjoyment of the subaqueous lands of the Commonwealth held in trust by it for the benefit of the public as conferred by the public trust doctrine and the Constitution of Virginia," Code § 28.2-1205(A).

In fact, the respondents' position appears to relate back to the Court's discussion in *Commonwealth v. City of Newport News*, 158 Va. 521, 539-50, 164 S.E. 689, 694-98 (1932), wherein the Court discussed judicial review of legislative decisions respecting "governmental purposes," exercised upon state-owned bottomlands, as proscribed save for such limitations "as are expressly provided for by or arise by implication from provisions contained in the State or Federal Constitution." (Citations omitted.) *Id.*, 158 Va. at 546-47, 164 S.E. at 696-97. Nevertheless, even that decision, which holdings would deem the permitting for commercial use of state-owned bottomlands as an exercise of the *jus privatum*, which power exercise bespeaks of greater judicial scrutiny than exercise of the *jus publicum*, necessarily anticipates judicial review of whether the legislature, or, as here, VMRC, correctly exercised its trustee-like duties pursuant to the public trust doctrine. *Id.*, 158 Va. at 546-51, 164 S.E. at 696-98.

Thus, within the context of this case, the Court must determine whether, upon giving the required deference to, presumption of official regularity in, and recognition of experience and specialized competence of VMRC within the domain of legislatively delegated authority, "substantial evidence in the agency record exists upon which the agency as the trier of facts could reasonably find them to be as it did." Va. Code § 2.2-4027. In its application of the public trust doctrine with respect to the non-water dependent second-story bar structure at issue here, the Court finds that no such substantial evidence exists and, as to that structure, the Court therefore must reverse VMRC's January 24, 2006, decision to grant Boone's permit application.

In its regulations, VMRC outlines considerations relevant to the permitting process and, in significant measure, echoes therein the requirements of Va. Code § 28.2-1205(A). *Subaqueous Guidelines*, Section I(C), "General Considerations Applying to All Permits" (November 2005 Ed.). In subsection (C)(2), among other things, the guidelines state:

> The Commission will also consider the water-dependency of the project and alternatives for reducing any anticipated adverse impacts.
>
> As defined by the Commission, water dependent means "those structures and activities that must be located in, on, or over State-owned submerged lands." When applying this definition, both of the following questions must be answered affirmatively:
>
> (1) Is it necessary that the structure be located over water? and,
>
> (2) Is it necessary that the activity associated with the structure be over water?
>
> Use of the definition for water dependency does not preclude issuance of a permit for non-water dependent structures over state-owned submerged lands. At public hearing, the Commission may determine that, while a structure is not water dependent, it is a reasonable use of state-owned submerged lands. These types of projects are evaluated on a case-by-case basis.

The Court finds reasonable and Harrison, *per se*, does not challenge VMRC's articulation of non-water dependent uses or its ability to include within permits permission to place some non-water dependent uses on piers

covering state-owned bottomlands. With respect to granting Boone's application, Harrison challenges VMRC's conclusion that the existence of the second-story bar structure upon the pier, clearly constituting a non-water dependent use, comports with the strictures of the public trust doctrine.

To support her position, Harrison argues that, when viewed for what it is, a bar, the second-story structure represents a redundant non-water dependent use upon the pier. That is, the large full-service restaurant and bar dominating the interior of the pier's main building, and located directly beneath the second-story bar structure, offers all of the services of the second-story structure. Moreover, Boone may find space for office-related tasks within the pier's main building, and, at one time, represented to VMRC that he intended to perform office functions on land. (Record 6-27.) Boone presented no evidence to establish an economic need for the structure. Finally, with respect to catered functions, the pier's main building offers more than adequate facilities for conducting them, including the support of functions taking place on the second-story deck. No evidence reveals just how the second-story bar structure will support catered functions; however, to the extent it does so for purposes other than selling alcoholic beverages, it represents an extremely marginal benefit to Boone and no real benefit to the public. A patron desiring to consume an alcoholic beverage on the pier's second-story deck need only walk down one flight of stairs to obtain one or, alternatively, request that a member of the restaurant's wait-staff bring the beverage to her or him. Boone testified that a temporary shelter may be used on the second-story deck for catered functions and thereby fully comply with Health Department requirements. (Record 4-18.) Boone clearly does not prefer to use temporary facilities to support catered functions on the second-story deck; however, his testimony makes clear that he can do so. (Record 4-18.) In adverse weather conditions, such as rain or high winds, catered functions obviously will not utilize the pier's second-story deck. Thus, no substantive difference exists, other than mere inconvenience to Boone, to use a temporary shelter instead of the second-story bar structure to support catered functions.

With respect to non-water dependent structures, the public trust doctrine must mean something. Yet, VMRC renders it meaningless by granting Boone's permit for the second-story bar structure when its functions merely duplicate already-permitted uses on the Ocean View Fishing Pier. At a minimum, proper application of the public trust doctrine requires avoidance of redundant non-water dependent uses at close proximity on the same pier. The Court rules that, under the circumstances of this case, VMRC misapplied the public trust doctrine. It thereby breached its duties to the public by permitting the second-story bar structure, when its intended non-water dependent use

serves only to duplicate facilities available within or from the pier's main building. The record establishes that the structure is not reasonable or even valuable to the greater public interest as a non-water dependent use, and, clearly, alternatives exist "for reducing any anticipated adverse impacts." *See, Subaqueous Guidelines, supra,* Section I(C)(2).

Thus, Harrison correctly contends that, pursuant to public trust doctrine consideration, substantial evidence does not exist to establish the second-story bar structure as a proper use of state-owned bottomlands and the Court will reverse VMRC's contrary decision.

## IX. *Conclusion*

For the reasons stated above, the Court rules that VMRC's January 24, 2006, decision to grant Boone's after-the-fact permit application respecting the second-story bar structure must be reversed: (a) because VMRC failed to observe required procedure which did not constitute harmless error, (b) failed to comply with statutory authority in arriving at its decision, and (c) the agency record lacks substantial evidence to support its decision. *See,* Va. Code § 2.2-4027.